**Baker & Hostetler LLP**  
45 Rockefeller Plaza  
New York, NY  10111  
Telephone: (212) 589-4200  
Facsimile: (212) 589-4201  
David J. Sheehan  
Keith R. Murphy

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the estate of Bernard L. Madoff*

Hearing Date:   December 17, 2014 at 10:00a.m.  
Objection Deadline:  December 10, 2014

**UNITED STATES BANKRUPTCY COURT**  
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>　　　　Plaintiff-Applicant,<br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>　　　　Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>　　　　Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>　　　　Plaintiff,<br>v.<br><br>ROBERT L. SILVERMAN, WESTPORT NATIONAL BANK, a division of CONNECTICUT COMMUNITY BANK, N.A., and PSCC SERVICES, INC.,<br><br>　　　　Defendants. | Adv. Pro. No. 10-05418 (SMB) |

**MOTION FOR ENTRY OF ORDER PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY CODE AND RULES 2002 AND 9019 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE APPROVING A SETTLEMENT BY AND BETWEEN THE TRUSTEE AND WESTPORT NATIONAL BANK, A DIVISION OF CONNECTICUT COMMUNITY BANK, N.A.**

TO:    THE HONORABLE STUART M. BERNSTEIN
       UNITED STATES BANKRUPTCY JUDGE

Irving H. Picard (the "Trustee"), as trustee for the substantively consolidated liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protections Act ("SIPA"), 15 U.S.C. § 78aaa *et seq.*, and the estate of Bernard L. Madoff ("Madoff," and together with BLMIS, the "Debtors"), by and through the Trustee's undersigned counsel, submits this motion (the "Motion") seeking entry of an order ("Approval Order"), pursuant to section 105(a) of title 11, United States Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code") and Rules 2002 and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), approving a settlement, the terms and conditions of which are set forth in the Settlement Agreement (the "Agreement")[1] by and between the Trustee and Westport National Bank, a division of Connecticut Community Bank, N.A. ("Westport" or the "Bank"; each of the Trustee and Westport a "Party" and collectively, the "Parties"). In support of the Motion, the Trustee respectfully represents as follows:

**PRELIMINARY STATEMENT**

1.     The Trustee commenced an action against Westport and the other defendants in this adversary proceeding to recover fraudulent transfers made by BLMIS to Westport regarding Westport's BLMIS Account No. 1W0106 (the "Account" or "Westport Account"). The Account was an omnibus account for the benefit of more than two hundred of Westport's banking clients. These clients generally made periodic redemptions over the twenty-plus year period that the

2

Westport Account and prior related accounts (operated by successive predecessors) were operational, to cover their living and retirement expenses. Fees that were paid from the Account to both Westport and to defendants Robert Silverman and his wholly owned businesses, the PSCC entities, were dissipated over that time.

2. Following mediation, the Trustee and Westport negotiated in good faith a complete settlement as to all disputes raised in the Adversary Proceeding against Westport. Under the Agreement, Westport will pay the Trustee a total of $1,300,000 ("Settlement Payment"). The Agreement will benefit the fund of customer property, as the Settlement Payment will increase the funds available for distribution to BLMIS customers with allowed claims. The Agreement will also result in the withdrawal of the customer claim filed against the estate by Westport.

3. The settlement with Westport will complete this chapter of the Madoff story, as the Trustee reached a separate agreement resolving his claims against Mr. Silverman and the PSCC entities. Mr. Silverman and the PSCC entities became insolvent and entered into bankruptcy, and the Trustee obtained partial satisfaction through an allowed claim in Mr. Silverman's bankruptcy. The Trustee's settlement with Westport therefore will obtain not only a direct monetary benefit for the estate, it also will dispose of all of the remaining claims in this Adversary Proceeding. The Trustee respectfully requests that the Court approve this settlement.

## BACKGROUND AND RELEVANT PROCEDURAL HISTORY

4. On December 11, 2008 (the "Filing Date"), the Securities and Exchange Commission ("SEC") filed a complaint in the United States District Court for the Southern District of New York (the "District Court") against the Debtors (Case No. 08 CV 10791). The

---

[1] The form of Agreement is annexed hereto as Exhibit "A."

3

complaint alleged that the Debtors engaged in fraud through the investment advisor activities of BLMIS.

5. On December 15, 2008, pursuant to section 78eee(a)(4)(A) of SIPA, the SEC consented to a combination of its own action with an application of the Securities Investor Protection Corporation ("SIPC"). Thereafter, pursuant to section 78eee(a)(3) of SIPA, SIPC filed an application in the District Court alleging, *inter alia*, that BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protection afforded by SIPA.

6. On that date, the District Court entered the Protective Decree, to which BLMIS consented, which, in pertinent part:

> (i) appointed the Trustee for the liquidation of the business of BLMIS pursuant to section 78eee(b)(3) of SIPA;
>
> (ii) appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to section 78eee(b)(3) of SIPA; and
>
> (iii) removed the case to this Court pursuant to section 78eee(b)(4) of SIPA.

7. On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff. On June 9, 2009, this Court entered an order substantively consolidating the chapter 7 estate of Madoff in the BLMIS SIPA liquidation proceeding.

### THE TRUSTEE'S CLAIMS AGAINST WESTPORT

8. The Trustee's claims in this action sought to recover fraudulent transfers from BLMIS to the Westport Account which was open between 1999 and December 2008. The Westport Account was the last in a succession of BLMIS accounts operated by predecessor banks, and is the account at issue in this good-faith case.

9. Westport, like its predecessors, operated the Westport Account as an omnibus account to address the BLMIS investment subscriptions and redemptions of more than two

4

hundred of the Bank's clients. The clients had been directed to Westport by Mr. Silverman and the PSCC entities, which performed actuarial and retirement services. Most, if not all, of those clients were individual retirees or pensioners who sought access to the apparently steady returns that BLMIS offered, and periodically redeemed money through the Westport Account to cover living and retirement expenses.

10. This pattern—in which the clients' redemptions and payments of fees to Westport and the other defendants exceeded subscriptions—began before 1999, and continued throughout the life of the Westport Account. Thus, by the time Westport opened the Westport Account in 1999 with a transfer of all the funds that were allegedly in the BLMIS account maintained by its predecessor, the Account in reality had a slightly negative balance. Between 1999 and 2008, the aggregate redemptions over time continued to exceed the aggregate subscriptions, and the Account never had a positive balance during the time that Westport held it.

11. According to BLMIS books and records, Westport withdrew a total of $28,200,000 from the Westport Account during the six-year period prior to the Filing Date (the "Six-Year Transfers"). From that amount, Westport and the other defendants in the Adversary Proceeding received fees. Mr. Silverman and the PSCC entities together received approximately $10 million in fees. Those moneys were dissipated over time, and the Trustee's investigation revealed that they would be all but impossible to recover. Despite being limited by the insolvency and bankruptcy proceedings, the Trustee was able to reach a settlement with Mr. Silverman through an allowed claim in his bankruptcy case, which was satisfied through a modest cash payment and a lien on Mr. Silverman's home.

12. Westport also received fees of approximately $2.1 million in the six-year period, and $660,000 in the two-year period, prior to the Filing Date.

5

13. On December 10, 2010, the Trustee commenced an adversary proceeding in the Bankruptcy Court against Westport and the other defendants in an action captioned *Picard v. Robert L. Silverman, Westport National Bank, a division of Connecticut Community Bank, N.A., and PSCC Services, Inc.*, Adv. Pro. No. 10-05418 (SMB).

14. In the Adversary Proceeding, the Trustee asserted liability to the BLMIS estate under sections 544, 547, 548, 550, 551 of the Bankruptcy Code, SIPA § 78fff-2(c)(3), the New York Fraudulent Conveyance Act (New York Debtor and Creditor Law ("NY DCL") §§ 273–279) and the New York Civil Procedures Law for the Six-Year Transfers. Specifically, the Adversary Proceeding seeks, *inter alia*, to avoid and recover all of the Six-Year Transfers, or their value, made to the Westport Account. The Trustee's Adversary Proceeding also seeks to disallow Westport's customer claim.

## WESTPORT'S CLAIMS AGAINST THE BLMIS ESTATE

15. Westport filed a customer claim, designated claim number 5309, for the Westport Account. Based on the ongoing litigation, the claim has not been determined or paid by Trustee.

## SETTLEMENT DISCUSSIONS AND TRUSTEE'S INVESTIGATION

16. Since 2010, Westport and the Trustee engaged in occasional settlement discussions, eventually agreeing to submit the case to mediation and more extensive settlement discussions.

17. In connection with the negotiations, the Trustee has conducted due diligence with respect to Westport's investments with BLMIS, the Westport Account, and the dealings between Westport, the Westport clients who invested through the Account and Mr. Silverman and the PSCC entities. In that regard, the Trustee requested and Westport produced thousands of pages of documents. The Trustee's investigation, conducted by his counsel and other advisors and consultants, included the review and analysis of the Westport's transactional histories as reflected

6

in the BLMIS account statements, correspondence, and other records and documents available to the Trustee, interviews with third parties who may have been potential witnesses in the Adversary Proceeding, and a substantial review of third-party records and documents.

18. Westport has disputed any wrongdoing or liability to the BLMIS estate for the Six-Year Transfers. Westport argued, *inter alia*, that it took no part in steering its clients to BLMIS, and that it did not provide any investment guidance or advice in connection with their clients' decisions to invest with BLMIS through the Westport Account. Westport cited to its custodial account agreements with its clients, which included specific provisions providing that the Bank has no authority or ability to direct or oversee in any manner the discretionary investments made by BLMIS; that the Bank would maintain adequate records indicating the ownership by the client of investments with BLMIS and held by the Bank as custodian for the client; and that the Bank is acting solely in a ministerial capacity in connection with the clients' investments. In further support of its position that it maintained only a ministerial role, Westport highlighted a provision in the custodial agreements that Westport would charge an annual custodial services fee equal to 6/10 of one percent of the average assets invested.

19. The Parties engaged a mediator to facilitate the settlement negotiations, which took place over the course of several months during 2014, and included the exchange of initial and reply mediation statements, numerous discussions with the mediator, and the submission of additional materials.

20. As a result of the Trustee's investigation and the Parties' successful negotiations, and after thorough consideration of the uncertainty, delay, costs and risks associated with the Adversary Proceeding, the Parties have determined it appropriate to settle this matter.[2]

### OVERVIEW OF THE AGREEMENT

21. The Trustee believes that the Agreement is in the best interests of the estate and will benefit the fund of customer property. The principal terms and conditions of the Agreement are summarized as follows (as stated above, the Agreement is attached as Exhibit "A" and should be reviewed for a complete account of its terms):

(a) <u>Settlement Payment</u>. Westport will make or cause to be made the Settlement Payment of $1,300,000 to the Trustee within 15 days of entry of an order approving the settlement.

(b) <u>Withdrawal of the Westport Claim</u>. As part of the consideration to the Trustee in connection with the settlement, Westport has delivered to the Trustee an executed Notice of Withdrawal of the Westport Claim with prejudice.

(c) <u>Mutual Releases</u>. In consideration for the covenants and agreements set forth in the Agreement, including the payment of the Settlement Payment, and except for the Parties' obligations to comply in all respects with the settlement, as set forth in the Agreement, the Trustee will release Westport, their professionals and agents, from any and all past, present or future actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, damages, judgments, and claims whatsoever, asserted or unasserted, known or unknown, claims arising out of or in any way

---

[2] Westport was separately sued by its clients in Connecticut federal court, and entered into a settlement agreement providing for payment of approximately $7.7 million to the bank clients, which together with the Trustee's settlement, results in Westport disgorging more than it received in fees for operating the Westport Account.

8

related to the claims asserted in the Complaint. Except with respect to any rights and obligations arising under the Agreement, effective upon the Closing Date, Westport will release SIPC, the Trustee and his professionals, agents and consultants, Madoff, BLMIS and their consolidated estate from any and all past, present, or future actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, damages, judgments, and claims whatsoever, asserted or unasserted, known or unknown, arising out of or in any way related to Madoff or BLMIS.

(j) <u>Dismissal of the Adversary Proceeding</u>. Within six business days after receipt of the Settlement Payment described above, the Trustee will file a Notice of Dismissal dismissing the Adversary Proceeding, with prejudice and without costs to either the Trustee or Westport.

22. The Settlement Payment of $1,300,000 will benefit the fund of customer property.

**RELIEF REQUESTED**

23. By this Motion, the Trustee respectfully requests that the Court enter an order, substantially in the form of the proposed order annexed hereto as Exhibit "B" approving the Settlement.

**LEGAL DISCUSSION**

24. Bankruptcy Rule 9019(a) states, in pertinent part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Courts have held that in order to approve a settlement or compromise under Bankruptcy Rule 9019(a), a bankruptcy court should find that the compromise proposed is fair and equitable, reasonable, and in the best interests of a debtor's estate. *In re Ionosphere Clubs, Inc.,* 156 BR 414, 426 (S.D.N.Y. 1993), *aff'd*, 17 F. 3d 600 (2d Cir. 1994) (citing *Protective Comm. for Index. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)).

9

25. The Second Circuit has stated that a bankruptcy court, in determining whether to approve a compromise, should not decide the numerous questions of law and fact raised by the compromise, but rather should "canvass the issues and see whether the settlement 'fall[ s] below the lowest point in the range of reasonableness.'" *In re W.T. Grant Co.*, 699 F.2d 599, 68 (2d Cir.), *cert. denied sub nom. Cosoff v. Romon*, 464 U.S. 822 (1983) (quoting *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir.), *cert. denied sub nom. Benson v. Newman*, 409 U.S. 1039 (1972)); *accord Nellis v. Shugrue*, 165 B.R. 115, 121–22 (S.D.N.Y. 1994); *In re Ionosphere Clubs*, 156 B.R. at 426; *In re Purified Down Prods. Corp.*, 150 B.R. 519, 522 (S.D.N.Y. 1993) ("[T]he court need not conduct a 'mini-trial' to determine the merits of the underlying litigation"); *In re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991).

26. In deciding whether a particular compromise falls within the "range of reasonableness," courts consider the following factors:

(a) the probability of success in the litigation;

(b) the difficulties associated with collection;

(c) the complexity of the litigation, and the attendant expense, inconvenience, and delay; and

(d) the paramount interests of the creditors.

*Nellis*, 165 B.R. at 122 (citing *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d at 292).

27. The bankruptcy court may credit and consider the opinions of the trustee or debtor and their counsel in determining whether a settlement is fair and equitable. *See In re Purified Down Prods.*, 150 B.R. at 522; *In re Drexel Burnham Lambert Grp.*, 134 B.R. at 505. The competency and experience of counsel supporting the settlement may also be considered. *Nellis v. Shugrue*, 165 B.R. at 122. Finally, the court should be mindful of the principle that "the law

favors compromise." *In re Drexel Burnham Lambert Group, Inc.*, 134 B.R at 505 (quoting *In re Blair,* 538 F.2d 849, 851 (9th Cir. 1976)).

28. The Trustee believes that the terms of the Agreement fall well above the lowest point in the range of reasonableness. The Agreement resolves all claims raised by the Trustee against Westport and avoids the cost and delay of what could otherwise be lengthy and contentious litigation regarding the Trustee's avoidance claims. The Agreement will bring in significant funds that will benefit the customer property estate. Accordingly, because the Agreement is well within the "range of reasonableness" and confers a substantial benefit on the estate, the Trustee respectfully requests that the Court approve Agreement. (Affidavit of the Trustee in Support of the Motion (the "Picard Affidavit")). A true and accurate copy of the Picard Affidavit is attached as Exhibit C.

## NOTICE

29. In accordance with Bankruptcy Rules 2002 and 9019, notice of this Motion has been given to (i) SIPC; (ii) the SEC; (iii) the Internal Revenue Service; (iv) the United States Attorney for the Southern District of New York; and (v) Todd G. Cosenza, Esq., Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019-6099. Notice of this Motion will also be provided via email and/or U.S. Mail to all persons who have filed notices of appearance in the BLMIS proceeding and to all defendants in the adversary proceeding pursuant to the Order Establishing Notice Procedures and Limiting Notice, ECF No. 4560. The Trustee submits that no other or further notice is required.

11

WHEREFORE, the Trustee respectfully requests entry of the Approval Order substantially in the form of Exhibit "B" granting the relief requested in the Motion.

Dated: November 21, 2014  
      New York, NY

/s *Keith R. Murphy*  
Baker & Hostetler LLP  
45 Rockefeller Plaza  
New York, New York 10111  
Telephone: (212) 589-4200  
Facsimile: (212) 589-4201  
David J. Sheehan  
Keith R. Murphy  
Geoffrey A. North  
Seanna R. Brown  
Brian F. Allen

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the estate of Bernard L. Madoff*